**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

EARL BRANTLEY,

                                        Plaintiff,

              - v -                                                Civ. No. 9:12-CV-1051
                                                                          (NAM/RFT)

BRIAN FISCHER, *Commissioner of New York State*
*Department of Corrections and Community Supervision*,
CARL KOENIGSMANN, *Chief medical Officer Division of*
*Health Services New York State Department of Corrections*
*and Community Supervision*, JOSEPH BELLNIER,
*Superintendent of Marcy Correctional Facility*, B. HILTON,
*Deputy Superintendent for Office of Mental Health*, MARK
KINDERMAN, *Deputy Superintendent for Programs at*
*Marcy Correctional Facility,* DR. K. VADLAMUDI, *Marcy*
*Correctional Facility Health Services Director*, SANDRA
MARTIN-KARAS, *Nurse Administrator of Marcy*
*Correctional Facility*, JANE DOE # 1 (AKA "KAREN"),
*Regional Health Services Director for New York State*
*Department of Corrections and Community Supervision*,

                                        Defendants.

**APPEARANCES:**                              **OF COUNSEL:**

**EARL BRANTLEY**
Plaintiff, *Pro Se*
09-A-2742
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13404

**HON. ERIC T. SCHNEIDERMAN**          **CHARLES J. QUACKENBUSH, ESQ.**
New York State Attorney General          Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Earl Brantley brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants (1) were deliberately indifferent to his serious medical needs, (2) subjected him to unconstitutional conditions of confinement, and (3) retaliated against him for filing grievances and seeking medical attention in violation of his First, Eighth, and Fourteenth Amendment rights. *See generally* Dkt. No. 1, Compl. Defendants move to dismiss the action, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 12. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED** in part and **DENIED** in part.

## I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v.*

*Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 754 n.6 (1963); *see also Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697 (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc.*

*Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## II. DISCUSSION

### A. Background

The following facts, taken from Plaintiff's Complaint, are accepted as true for the purposes of evaluating Defendants' Motion to Dismiss.

Plaintiff arrived at Downstate Correctional Facility ("DCF") shortly after May 28, 2009. Compl. at ¶ 18. Prior to his arrival at DCF, Plaintiff suffered an injury in a car accident which limited his ability to walk. Compl. at ¶ 19. Plaintiff was treated with blood thinner and pain medication for about a week and a half before he was transferred to Five Points Correctional Facility. *Id.* at ¶ 21.

"Five months into [P]laintiff's sentence, his right ankle and knee began to swell causing him severe pain and a burning sensation, with his skin peeling on the right leg, calf, ankle to the point where his toe nails had turned black with severe swelling along with his right knee popping out of place." *Id.* at ¶ 22. At Walsh Regional Medical Unit ("WRMU")[1] Plaintiff was diagnosed with osteoporosis in his ankle, a torn ACL, torn meniscus, and other torn ligaments in his right knee and was told that "surgery was needed to correct the problem." *Id.* at ¶¶ 23–24.

---

[1] It is unclear from the Complaint when Plaintiff was transferred to WRMU.

In November of 2010,[2] Plaintiff was transferred to Marcy Correctional Facility ("MCF"). *Id.* at ¶ 34. After three days, Plaintiff reported to sick call complaining that he was experiencing severe pain when sitting, standing, or walking, and that his right leg was "severely swollen compared to his left leg." *Id.* at ¶¶ 35–36. MCF's Facility Health Services Director, Defendant Dr. Vadlamudi, saw Plaintiff that day and told him that his condition was chronic, that nothing could be done for him, and sent him away without prescribing any medication. *Id.* at ¶¶ 36–37.

On December 2, 2010, Plaintiff filed a grievance complaining of his painful condition, lack of treatment, and the fact that he was being forced to participate in programs while in pain. The response from the Central Office Review Committee ("CORC") "was unsuccessful." *Id.* at ¶¶ 38–39. On January 13, 2011, Plaintiff filed another grievance requesting treatment from a specialist for his ankle. That grievance was also denied; Plaintiff appealed, and CORC denied the appeal. *Id.* at ¶¶ 41–42. On February 9, 2011, Plaintiff filed a third grievance complaining of the fact that he had to walk to and from programming because he had no wheelchair nor walker, that he "was harassed with a misbehavior report because he complained about his condition" and was afraid of being sent to the Special Housing Unit ("SHU") as a result; and that despite his complaints and the fact that his condition was worsening, MCF's medical staff refused to excuse him from programming and told him they could do nothing to assist him. *Id.* at ¶¶ 43 & 45– 47.

On March 17, 2011, a hearing was held regarding Plaintiff's third grievance wherein it was determined that further investigation was necessary because "the issue has been a continued problem for numerous months with grievant and his medical problem." *Id.* at ¶ 50 & Ex. D, Portion of IGRC response Lt., dated Mar. 17, 2011. Plaintiff appealed to MCF's Superintendent, Defendant J.

---

[2] The exact date Plaintiff was transferred is not clear from the record.

Bellnier. Defendant Bellnier responded that Plaintiff should be utilizing the medical stocking issued to him; however, Plaintiff denies ever being issued any such stocking. Plaintiff appealed the Superintendent's decision to CORC, which denied Plaintiff's grievance. *Id.* at ¶¶ 51–55. That same day, Deputy Superintendent for the Office of Mental Health Defendant B. Hilton wrote to Plaintiff to inform him that he had refused a wheelchair and "if Plaintiff continues to experience problems with his ankle, he would be placed on program restrictions, . . . for not following medical treatment." *Id.* at ¶ 59. Plaintiff avers that he "has never refused treatment of any kind." *Id.* at ¶ 60.

Plaintiff wrote MCF's Deputy Superintendent of Programs, Defendant Mark Kinderman, requesting that he be granted a reasonable accommodation excusing him from programming due to his disability.[3] Defendant Dr. Vadlamudi denied this request and Defendant Kinderman sent Plaintiff a memorandum informing him that he had been medically cleared for programming by the doctor and was expected to participate in all required programming. *Id.* at ¶¶ 56–58.

On March 22, 2011, Plaintiff went to sick-call complaining that his ankle was swollen and his knee had popped out of the socket causing him pain. Medical staff refused to give Plaintiff any medication to relieve his pain and swelling and refused to excuse him from programming. Instead, Plaintiff was sent back to his housing unit. While walking back to his housing unit, Plaintiff fell and could not get up. An unidentified officer requested emergency medical assistance over the radio, and Plaintiff was rushed back to medical where he was told that he was alright and was once again sent back to his housing unit without medication. *Id.* at ¶¶ 61–65.

On the way back to his housing unit, Plaintiff's knee began to pop out of the socket again.

---

[3] It is unclear from the Complaint when Plaintiff made this request of Defendant Kinderman. *See* Compl. at ¶¶ 56–58.

-6-

Plaintiff notified the Housing Unit Officer[4] that he was in such severe pain that he could not get out of bed. The Officer relayed this complaint to the medical department by telephone and, without any further investigation, medical[5] stated that Plaintiff was "fine" and had been cleared for programming. *Id.* at ¶ 68. The Housing Unit Officer gave Plaintiff a "[d]irect [o]rder" to report to programming. Plaintiff responded that he could not move nor get out of bed and that he needed sick-call. *Id.* at ¶ 69. Rather than calling medical, the Officer called the Area Supervisor, who along with three unidentified Officers escorted Plaintiff to SHU.[6] Plaintiff was placed in a "dirty, cold cell with a urin[e] scented mattress and dirty linen and used dirty clothing." *Id.* at ¶¶ 70–71. Still in pain, Plaintiff requested sick call seven days in a row while in SHU, but his requests were ignored by MCF's guards, and Plaintiff was never seen by any medical staff. *Id.* at ¶ 72.

## B. Analysis

On October 4, 2012, during an initial review of Plaintiff's Complaint, the Honorable Normon A. Mordue, United States District Judge, found that

> [c]onstrued liberally, plaintiff's complaint alleges that defendants denied him adequate medical care in deliberate indifference to his serious medical needs, subjected him to cruel and unusual punishment, and retaliated against him for filing grievances and seeking medical attention, in violation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.

Dkt. No. 5, Dec. and Order, dated Oct. 4, 2012, at p. 4.

Defendants argue that Plaintiff's Complaint should be dismissed on the grounds that Plaintiff failed to (1) state a deliberate medical indifference claim, (2) allege that any of the remaining Defendants were personally involved in any constitutional violations, or (3) establish that any Defendant acted

---

[4] The Housing Unit Officer is not a named Defendant in this action.

[5] Plaintiff does not identify the person at medical who took the call or made these statements.

[6] Neither the Area Supervisor nor the three unidentified Officers are named Defendants in this action.

with the requisite mental culpability necessary to establish an Eighth Amendment violation. *See generally* Dkt. No. 12-1, Defs.' Mem. of Law.

### *1. Cruel and Unusual Punishment*

Plaintiff claims that Defendants subjected him to cruel and unusual punishment by (1) confining him to a cold and filthy SHU cell with a urine scented mattress and dirty clothes and linens, and (2) refusing to provide him with adequate medical care for his severely swollen and painful leg condition. *See generally* Compl.

The Eighth Amendment prohibits cruel and unusual punishment. Punishment encompasses deprivations imposed incident to imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if incompatible with "evolving standards of decency that mark the progress of a maturing society." *Id*. at 102.

In addition, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### a. Conditions of Confinement

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)).

In *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

> Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Helling* [*v. McKinney*], 509 U.S. 25, 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency. *Id.* at 35-36; *Rhodes* [*v. Chapman*], 452 U.S. 337[,] 347

[(2002)].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer* [*v. Brennan*], 511 U.S. [825,] 837 [(1994)].

*Phelps v. Kapnolas*, 308 F.3d at 185-86.

Plaintiff claims that his SHU cell was cold and dirty, contained dirty linens, soiled clothes, and a mattress that smelled like urine, and that his repeated requests for medical attention were ignored for seven days in a row. Compl. at ¶¶ 70–72. Although Plaintiff does not provide detailed information – *i.e.*, the total amount of time he was exposed to these conditions, how "cold" the cell was, or how the cold affected him – it is nonetheless plausible that these sparse allegations are sufficient to establish that Defendants deprived Plaintiff of the "minimal necessities of civilized life." *See Walker v. Schult*, 717 F.3d 119, 128–29 (2d Cir. 2013) (noting that subjecting prisoners to unsanitary conditions and cold can deprive them of the "minimal necessities of civilized life," and overturning a district court's decision granting defendants motion to dismiss a conditions of confinement claim because although the prisoner did not provide many details about how the conditions of confinement affected him, "such detailed allegations, . . . , [were] not required for a *pro se* complaint to survive a motion to dismiss."). However, we need not dwell on this issue, because regardless of whether the alleged conditions were objectively sufficiently serious, Plaintiff's claim is still fatally flawed.

The chief deficiency in Plaintiff's Complaint is that he wholly fails to allege any facts from which it could plausibly be concluded that any of the named Defendants were aware of the conditions of his confinement, and therefore, that any of them were personally involved in

*-10-*

subjecting him to those conditions. Indeed, Plaintiff alleges only that an unnamed Area Supervisor and approximately 3 unnamed Officers put him in SHU after he failed to follow a direct order to report to programming. Compl. at ¶¶ 69–70. Likewise, although he claims that his requests for medical attention were denied while in SHU, he states they were ignored by unnamed officers. *Id.* at ¶ 72. Moreover, nothing in the record suggests that any of the named Defendants were ever made aware of the conditions under which he allegedly languished while in SHU.[7] Accordingly, it is implausible to suggest that any of the named Defendants could have acted with deliberate indifference towards the conditions of Plaintiff's confinement.[8] *See Farmer v. Brennan*, 511 U.S. at 837.

While Plaintiff's failure to link any of the named Defendants to this claim would certainly justify outright dismissal, in light of Plaintiff's *pro se* status, we recommend that his conditions of confinement claim be **DISMISSED** without prejudice and that Plaintiff be **GRANTED** leave to amend in order to afford him an opportunity to correct these deficiencies. *See Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (cautioning courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *see also Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)

---

[7] Plaintiff attached several documents to his Complaint, including a portion of his grievance record. We are aware of the fact that in two of those documents Plaintiff mentions being put in SHU. However, neither of these documents would have put the recipients on notice of any potentially unconstitutional conditions of that SHU confinement because Plaintiff made no mention whatsoever of the conditions of the SHU cell within which he was confined. *See* Compl. at Ex. H, at Lt., dated April 19, 2011, & Grievance, dated April. 13, 2011.

[8] It is also worth noting that, unlike Plaintiff's explicit supervisory liability allegations against the named Defendants regarding his deliberate medical indifference claim, Plaintiff does not allege that any of the Defendants were liable in their supervisory capacities as to his conditions of confinement claim. *Compare* Compl. at Fifth Cause of Action, *with id.* at ¶¶ 70–72; *see also infra* at Part II.B.1.c. (discussing supervisory liability).

("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se*] complaint gives any indication that a valid claim might be stated.").

Should the District Judge adopt this recommendation, we provide the following guidance for Plaintiff in drafting an amended complaint. Plaintiff should note that any amended complaint, **which shall supersede and replace in its entirety the previous Complaint**, must contain a caption that identifies, by name, each individual and/or entity that Plaintiff is suing in the present lawsuit, and must bear the case number assigned to this action. **Plaintiff should note that any defendant not named in the amended pleading shall not be a defendant in this action.** No portion of any prior Complaint shall be incorporated into his amended complaint by reference. The body of Plaintiff's amended complaint must contain **sequentially numbered paragraphs containing only one act of misconduct per paragraph**. If Plaintiff claims that his civil and/or constitutional rights were violated by more than one defendant, or on more than one occasion, he shall include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying (i) the alleged act of misconduct; (ii) the date on which such misconduct occurred; (iii) the names of each and every individual who participated in such misconduct; (iv) where appropriate, the location where the alleged misconduct occurred; and, (v) the nexus between such misconduct and Plaintiff's civil and/or constitutional rights.

### b. Deliberate Medical Indifference

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 834-35; *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated

*-12-*

that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

There can be little doubt that Plaintiff has plausibly alleged a sufficiently serious medical condition for purposes of the Eighth Amendment. Here, Plaintiff's allegations that his left leg was severely swollen compared to his right leg, that he was in severe and chronic pain, unable to walk

or stand at times, had dislocated his knee, and was diagnosed with osteoperosis in his ankle and several torn several ligaments in his knee that may require corrective surgery, are more than sufficient to establish that his leg injury was both worthy of comment or treatment by a doctor and severely affected his ability to go about his daily activities. *Chance v. Armstrong*, 143 F.3d at 702.

With regard to the subjective element, Plaintiff claims that when he first arrived at MCF in November of 2010, he had an appointment with Defendant Vadlamudi. After viewing his leg, Dr. Vadlamudi told Plaintiff that there was nothing he could do for him and turned him away without even providing a prescription to reduce the pain and swelling. Compl. at ¶¶ 34–37. Such an allegation is more than sufficient, at this early stage, to plausibly establish that Defendant Vadlamudi acted with a conscious disregard to a known risk of harm. Moreover, because Dr. Vadlamudi personally treated Plaintiff on this occasion it cannot be gainsaid that he was not personally involved. Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Vadlamudi.

In addition to Plaintiff's allegations against Dr. Vadlamudi, Plaintiff alleges that he was denied medical treatment for his condition on other occasions by medical and non-medical personnel at MCF. For example, Plaintiff claims that he was denied medical care by unidentified medical staff on March 22, 2011, after he allegedly fell to the ground and his knee popped out of the socket. *See* Compl. at ¶¶ 61–65. And, that when he was in SHU, prison guards ignored his requests for medical attention for seven days in a row. *Id.* at ¶ 72. Indeed, the IGRC recommended that a further investigation into Plaintiff's medical complaints be conducted because the "issue has been a continued problem for numerous months." *See* Compl. at ¶ 50 & Ex. D, Portion of IGRC response Lt., dated Mar. 17, 2011. To the extent that these claims implicate non-medical personnel such as

guards at MCF, such persons can be deliberately indifferent to an inmate's medical needs where "they intentionally deny or delay access to medical care." *Jean v. Barber*, 2011 WL 2975218, at *5 (N.D.N.Y. July 21, 2011) (citations omitted); *see also Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) ("Non-medical prison personnel engage in deliberate indifference where they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.'"). However, with the exception of his allegations against Dr. Vadlamudi, Plaintiff fails to name or identify the medical and/or non-medical personnel that were personally involved in denying or delaying care on these other occasions. Having failed to establish that any of the remaining named Defendants directly denied medical care to Plaintiff, Plaintiff's complaints against them can only survive to the extent that he has plausibly alleged their personal involvement *via* a theory of supervisory liability.

### c.  Supervisory Liability

In addition to naming them and including a description of their job duties in the Complaint, Plaintiff alleges that each of the named Defendants are liable in their supervisory capacities because they "all failed to properly train their subordinates on how to correctly diagnose, treat and apply proper medical treatment." Compl. at ¶¶ 3–11 & Fifth Cause of Action. Standing alone, such a conclusory allegation is insufficient as a matter of law to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, we must analyze what, if any, other allegations Plaintiff has made against the remaining Defendants in order to determine whether he has plausibly alleged that they should be held liable in their supervisory capacities.

#### i.  Defendant Fischer

Aside from the caption, the conclusory allegation noted above, and a description of his job

duties as the Commissioner of DOCCS, Defendant Fischer is not mentioned anywhere else in the Complaint. Moreover, nothing in the enumerated paragraphs of the Complaint indicates that Defendant Fischer was even aware of Plaintiff's medical condition or his alleged inability to receive treatment.[9] *See generally* Compl. And, although Plaintiff has alleged a fairly widespread and prolonged history of abuse and neglect at MCF,[10] Defendant Fischer's position is so far removed from daily life at MCF that it would be implausible to conclude that he knew or should have known about Plaintiff's circumstances merely because of his position of authority. *See Colon v. Coughlin*, 58 F.3d at 873-74 (concluding that "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a § 1983] claim"); *see also Silvagnoli v. Fischer*, 2010 WL 1063849, at *8 (N.D.N.Y. Mar. 1, 2010) (dismissing DOCCS Commissioner from a § 1983 claim on similar grounds and under similar circumstances).

Thus, Plaintiff has failed to allege that Defendant Fischer was personally involved in any violations of Plaintiff's constitutional rights. However, as noted *infra* at Part II.B(1)(c)(iv), outright dismissal of Defendant Fischer would be premature at this time.

### ii. Defendant Koenigsmann

In addition to including Defendant Koenigsmann in the caption, Plaintiff provides a

---

[9] Although Plaintiff clearly failed to explicitly state that Defendant Fischer was aware of his condition or his alleged lack of treatment, Plaintiff has alleged that his fiancée Keyaira Hawkins made various inquiries on his behalf in an effort to get Plaintiff treatment for his leg. Compl. at ¶¶ 48 & 49. In addition, Plaintiff attached various documents from his fiancée, including a document entitled "List of some people I have spoken to." *Id.* at Ex. E. In that document Ms. Hawkins claims that she contacted "Brian Fish[c]er - He listened to everything I had to say, Called Marcy C.F. where he was told that Earl was not following directions given to him therefore there was nothing he could do." *Id.* at ¶ 2. Ms. Hawkins's undated and unsigned claim that she conveyed to Defendant Fischer "everything [she] had to say" is far too vague for us to conclude that it put Defendant Fischer on notice of any unconstitutional acts. However, such claims do weigh into our determination as to whether Plaintiff should be granted leave to amend. *Branum v. Clark*, 927 F.2d at 705; *see also infra* n.12 and accompanying text.

[10] Indeed, the IGRC recommended that a further investigation into Plaintiff's medical complaints be conducted because the "issue has been a continued problem for numerous months." *See* Compl. at ¶ 50 & Ex. D, Portion of IGRC Resp. Lt., dated Mar. 17, 2011.

description of Defendant Koenigsmann's duties as Chief Medical Officer of DOCCS. Plaintiff notes that Defendant Koenigsmann is "responsible for the oversight of all medical aspects of the department and it's agents and employees." Compl. at ¶ 4. Beyond that, Defendant Koenigsmann is not mentioned at all in the Complaint. *See generally id.* However, Plaintiff attached a copy of a letter he received from one of Dr. Koengsmann's subordinates, which states, in pertinent part, that "Dr. Koenigsmann, Chief Medical Officer, has asked me to respond to your recent letter concerning your health care issue." *Id.* at Ex. H. Even if Plaintiff included an allegation in his Complaint regarding this letter, such a claim would still be insufficient to establish supervisory liability by Defendant Koenigsmann. *See Silvagnoli v. Fischer*, 2010 WL 1063849, at *8 (citing cases for the proposition that "[i]t is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement" and that "[t]he same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation") (citations omitted). Moreover, like Defendant Fischer, Defendant Koenigsmann is far too removed from the day-to-day operations at MCF for it to be plausibly concluded that he knew or should have known of Plaintiff's complaints by virtue of his supervisory position alone. Therefore, Plaintiff has failed to allege that Defendant Koenigsmann was personally involved in any constitutional wrongdoing. However, as noted *infra* at Part II.B(1)(c)(iv), outright dismissal of Defendant Koenigsmann would be premature at this time.

### *iii. Defendant Kinderman*

In addition to naming Defendant Kinderman in the caption, Plaintiff includes a description of Defendant Kinderman's duties as Deputy Superintendent of Programs at MCF. According to Plaintiff, Defendant Kinderman was "responsible for the administration of all programs and related

functions of the facility." Compl. at ¶ 7. Plaintiff also alleges that around March 2011, he wrote to Defendant Kinderman requesting that he be granted a reasonable accommodation based on his disability to be excused from programming. According to Plaintiff, Defendant Kinderman denied this request on the grounds that "Plaintiff was medically cleared for programs and that it was the determination of the doctor that Plaintiff was able to program, therefore, he was expected to report to his assigned program." Compl. at ¶¶ 56–58. Thus, it is possible that Defendant Kinderman was aware of Plaintiff's medical condition and treatment issues. However, regardless of whether or not Defendant Kinderman was on notice of Plaintiff's medical issues, it is not plausible to infer that a Deputy Superintendent of Programs had any authority over, or responsibility to train, MCF's medical staff on how to properly diagnose and treat Plaintiff's injuries. Moreover, even if Plaintiff has alleged that Defendant Kindermann, a non-medical official at MCF, was aware of Plaintiff's issues Plaintiff alleges that he required Plaintiff to attend programming, not that he denied or delayed Plaintiff's medical care in some way. *Cf. Jean v. Barber*, 2011 WL 2975218, at *5. Therefore, Plaintiff has failed to allege personal involvement on behalf of Defendant Kinderman. However, as noted *infra* at Part II.B(1)(c)(iv), outright dismissal of Defendant Kinderman would be premature at this time.

### iv. Defendant O'Donnell

In addition to naming him in the caption, Plaintiff also described Defendant O'Donnell's responsibilities as Senior Corrections Counselor at MCF. According to Plaintiff, Defendant O'Donnell was "responsible for the oversight of all corrections counselor's at the facility." Compl. at ¶ 10. However, Plaintiff makes no other allegations against Defendant O'Donnell in the

Complaint.[11]  Moreover, like Defendant Kinderman, Plaintiff has not alleged that Defendant O'Donnell delayed or denied him access to medical care.  Nor is it reasonable to infer that MCF's Senior Corrections Counselor had any authority over, or responsibility to train, MCF's medical staff on how to properly diagnose and treat inmate injuries.  Thus, Plaintiff has failed to allege that Defendant O'Donnell was personally involved in any deliberate medical indifference.

Plaintiff's failure to include sufficient factual allegations in his Complaint implicating Defendants Fischer, Koenigsmann, Kinderman, and O'Donnell would certainly warrant outright dismissal of his supervisory liability claims against them.  However, in light of Plaintiff's *pro se* status, we recommend that Plaintiff's Eighth Amendment medical indifference claims against these four Defendants be **DISMISSED** without prejudice and that Plaintiff be **GRANTED** leave to amend his Complaint in order afford him an opportunity to cure the deficiencies noted above.[12]

### v. Defendant Bellnier

In addition to naming him in the caption, Plaintiff also described Defendant Bellnier's responsibilities as Superintendent of MCF.  According to Plaintiff, Defendant Bellnier "is responsible for the general oversight and administration of the facility and it's [sic] agents and

---

[11] Once again, we note that Plaintiff's fiancée claims, without providing any detail, that she contacted the Senior Counselor at MCF, who "was very rude and inconsiderate" and claimed that there was nothing he could do.  Compl., Ex. E at ¶ 5.  Like Ms. Hawkins's claims regarding Defendant Fischer, *see supra* n. 9, these undated, unsigned claims that identify Defendant O'Donnell solely by his title as Senior Counselor at MCF, are too vague to plausibly establish that Defendant O'Donnell was personally involved in any constitutional wrongdoing.  *But see infra* n.12.

[12] Allowing Plaintiff an opportunity to amend is warranted, especially with regard to Defendants Fischer and O'Donnell because of the potential implications of Plaintiff's fiancée's vague, unsigned, and undated claims that she contacted these Defendants, ostensibly putting them on notice of Plaintiff's condition and his alleged inability to receive adequate treatment.  *See Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) (overturning a district court's decision to deny leave to amend to a *pro se* plaintiff where plaintiff had produced a letter, which he claimed to have sent to a supervisory official and, if received, would have put that official on notice of certain constitutional violations).

employees." Compl. at ¶ 5. Plaintiff also alleges that he appealed the denial of his February 9[13]
grievance to Defendant Bellnier and that Defendant Bellnier's "response was contrary to grievant's
complaint." *Id.* at ¶¶ 50–52. On February 9, 2011, Plaintiff had submitted a grievance regarding
the fact that he was being forced to walk back and forth to programming and also describing his
medical condition, and noting that he had requested and had been denied medical treatment for his
leg. *Id.* at ¶¶ 43–47, & Ex. D. On April 6, 2011, Defendant Bellnier issued and signed a written
denial of Plaintiff's grievance appeal. *Id.* at Ex. D.

Construing all evidence in Plaintiff's favor, at this early stage such an allegation is sufficient
to plausibly allege that Defendant Bellnier was both aware of Plaintiff's medical issues and – given
the fact that Plaintiff continued to be denied treatment after April 6, 2011 – that he failed to remedy
the situation. *See Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986). Moreover, it is also
patently reasonable to infer that MCF's Superintendent knew or should have known of the alleged
widespread pattern of medical neglect Plaintiff alleges to have occurred at MCF because, unlike
Defendants Fischer and Koenigsmann, Defendant Bellnier was or should have been familiar with
the day-to-day operations of MCF.

Therefore, Plaintiff has plausibly stated a claim based on supervisory liability against
Defendant Bellnier. Accordingly, we recommend that Defendants' Motion be **DENIED** as to
Plaintiff's claim against Defendant Bellnier.

---

[13] In his Complaint Plaintiff states that he appealed the results of his February 10 grievance to Defendant
Bellnier. Compl. at ¶ 50. However, whereas Plaintiff provided a copy of a grievance dated February 9, as well as a
response to that grievance from Defendant Bellnier in the Exhibits attached to his Complaint, there is no other mention
of a February 10 grievance in either the Complaint or the attached Exhibits. *See* Compl. at ¶¶ 42, 50, and Ex. D.
Therefore, we conclude that this was a typo, and that Plaintiff was actually referring to his February 9 grievance.

### vi. Defendant Hilton

In addition to naming him in the caption, Plaintiff also described Defendant Hilton's responsibilities as Deputy Superintendent for the Office of Mental Health. According to Plaintiff, Defendant Hilton "is responsible for the operation of the Marcy Regional Mental Health Unit." Compl. at ¶ 6. Plaintiff claims that he received correspondence from Defendant Hilton on March 17, 2011, which stated, in pertinent part, that "I am responding to your letter regarding your medical issues. I have followed up with Medical." *Id.* at ¶ 59 & Ex. G. Construing all evidence in Plaintiff's favor, such an allegation is sufficient to plausibly allege that Defendant Hilton was both aware of Plaintiff's medical issues and that, despite investigating Plaintiff's complaints, he failed to remedy the situation. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (citing cases for the proposition that "[p]ersonal involvement will be found, . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Therefore, Plaintiff has plausibly stated a claim based on supervisory liability against Defendant Hilton. Accordingly, we recommend that Defendants' Motion be **DENIED** as to Plaintiff's claim against Defendant Hilton.

### vii. Defendant Martin-Karas

In addition to naming her in the caption, Plaintiff also describes Defendant Martin-Karas's responsibilities as the Nurse Administrator at MCF. According to Plaintiff, Defendant Martin-Karas "is responsible for the administration and staff of the medical department at Marcy." Compl. at ¶ 9. Although Plaintiff fails to include any other factual allegations against Defendant Martin-Karas in the body of his Complaint, he attached correspondence between himself and Defendant Martin-

Karas. Compl. at Ex. I. In one such letter, Plaintiff specifically alerted Defendant Martin-Karas to his condition and the fact that he was not receiving adequate treatment. In response Defendant Martin-Karas wrote, "[c]ome to sick call and discuss your medical issues." *Id.* at Lt., dated July 7, 2011. Therefore, Plaintiff has plausibly alleged that Defendant Martin-Karas was personally involved in Plaintiff's medical care. *See Johnson v. Wright*, 234 F. Supp. 2d at 363.

## *2. Retaliation*

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or

she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

Plaintiff's retaliation claim is vague and difficult to decipher. According to Plaintiff, "defendant's [sic] retaliated against plaintiff by issuing fabricated misbehavior report(s) and locking him in SHU because he was physically unable to walk." Compl. at Third Cause of Action. And, "that he was harassed with a misbehavior report because he complained about his medical condition." *Id.* at ¶ 45. Plaintiff fails to clearly identify who wrote the misbehavior report or reports or when the report or reports were issued. Moreover, it is unclear what, if any, constitutionally protected exercise Plaintiff is alleging substantially motivated the unidentified officer(s) to issue false misbehavior report(s) against him. *See* Compl. at ¶¶ 43, 45–46, & 53–55. Specifically, it is unclear whether Plaintiff is alleging that he was issued a false misbehavior report because he asked for medical treatment, or that the false reports were issued in retaliation for Plaintiff filing grievances regarding his belief that his medical needs were generally being neglected.

A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'" *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Rather, "there must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997)).

It is now a well accepted principle that "[a]n allegation that a prison official filed false

disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir. 2002). Yet, it is far less clear whether the First Amendment protects prisoners' right to demand necessary medical attention. *See Brown v. White*, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010) (citing cases and noting that neither the Supreme Court nor the Second Circuit have ruled on this issue).

However, we need not dwell on these issues because regardless of which action may have motivated Defendants to act, Plaintiff's failure to allege with any particularity who issued these reports is fatal to his claim.[14] *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Moreover, to the extent that Plaintiff seeks to claim that any of the named Defendants were liable in their supervisory roles, such claims are insufficient because it is entirely unclear which, if any, of the Defendants were made aware of the alleged retaliatory acts; and even if they were, it is impossible to tell whether they were alerted in time to have been able to put a stop to the alleged retaliatory behavior. *See Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) (noting that "the wrong . . . [must] have been capable of mitigation at the time the supervisory official was apprised thereof" (citation omitted)); *see also Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). While these errors would certainly justify outright dismissal of this claim, given Plaintiff's *pro se* status, we recommend that the claim be **DISMISSED**

---

[14] Moreover, Defendants have not moved to dismiss this claim on the grounds that he failed to establish the elements of retaliation. Rather, they object only insofar as they have globally claimed that "[t]he Complaint . . . is devoid of allegations that individual defendants have directly participated in identifiable actions/omissions which have directly caused plaintiff to suffer any sort of injury." *See* Defs.' Mem. of Law at p. 3. In fact, Defendants do not specifically address Plaintiff's retaliation claim at all. *See, e.g., id.* at p. 2. (stating that "Plaintiff frames five causes of action, all of which involve theories of medical deliberate indifference under the Eighth Amendment to the U.S. Constitution").

without prejudice and that Plaintiff be **GRANTED** leave to amend his Complaint in order to afford him an opportunity to remedy these deficiencies.

### C. Doe Defendant

In addition to those Defendants which Plaintiff has properly identified and served, Plaintiff has also named Jane Doe "aka Karen" as a Defendant in this action. Compl. at ¶ 11. On October 4, 2012, the Honorable Norman A. Mordue, United States District Judge, warned Plaintiff that his failure to identify and properly name and serve Jane Doe could result in the dismissal of his claims against her. *See* Dkt. No. 5., Dec. and Order, dated Oct. 4, 2012, at p. 7. Once again, we caution Plaintiff that if he fails to identify and properly serve the Doe Defendant, Plaintiff's claims against the Doe Defendant will be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 12) be **GRANTED** in part and **DENIED** in part, as follows:

1.   **GRANTED** without prejudice as to Plaintiff's conditions of confinement and First Amendment retaliation claims against all Defendants;
2.   **GRANTED** without prejudice as to Plaintiff's deliberate medical indifference claim against Defendants Fischer, Koenigsmann, Kinderman, and O'Donnell;
3.   **DENIED** as to Plaintiff's deliberate medical indifference claim against Defendants Vadlamudi, Hilton, Bellnier, and Martin-Karas; and it is further

**RECOMMENDED** that if the above recommendations are accepted, Plaintiff should be directed to file an amended complaint that cures some of the deficiencies cited herein. Such amended complaint should be filed within thirty (30) days of the Memorandum-Decision and Order issued by the District Judge. If Plaintiff filed an amended complaint, the file shall be returned to the

undersigned so that it can be reviewed.  If Plaintiff opts not to file an amended complaint within the allotted time, then Defendants Fisher, Koenigsmann, Kindermann, and O'Donnell should be terminated from this action without further order from the Court as Plaintiff has failed to plausibly allege their personal involvement in any constitutional wrongdoing; and it is further

      **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   September 13, 2013
       Albany, New York

                           Randolph F. Treece
                           U.S. Magistrate Judge